Filed 3/9/23  P. v. Murillo CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C094665 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE020278) |
| v. | |
| FERNANDO ELIAS MURILLO, | |
| Defendant and Appellant. | |

A jury found defendant Fernando Elias Murillo guilty of multiple sex offenses. He was sentenced to an aggregate term of 32 years in state prison.  On appeal, he makes several challenges to his conviction, including that the admission of child sexual abuse accommodation syndrome evidence was error, and that he was deprived of a fair trial when a juror was removed during deliberations without the appropriate inquiry into allegations of juror misconduct.  He also argues the trial court erred in imposing upper term sentences due to the amendments to Penal Code section 1170, subdivision (b), made by Senate Bill No. 567 (2021-2022 Reg. Sess.).  We agree with defendant in this last regard and shall remand his case for resentencing, but otherwise affirm the judgment.

1

# FACTUAL AND PROCEDURAL BACKGROUND

Given the nature of the instant appeal, we briefly summarize the facts supporting the conviction. We will expand upon facts necessary for the resolution of each issue as we address them.

Defendant is the brother of Rene Murillo and uncle to Rene's children Y.D., F.D., and J.D. The families lived in the same apartment complex and saw each other frequently. In 2010, Y.D. told law enforcement that her father, Rene, sexually assaulted her. Rene was subsequently convicted of sexual abuse. In 2012, Y.D., F.D., and J.D. made sexual abuse allegations against defendant.[1]

*Y.D.'s Allegations*

In the summer of either 2010 or 2011, when Y.D. was 12 or 13 years old, she and a friend went swimming with defendant in the pool at their apartment complex. At one point, Y.D.'s friend left the pool. Y.D. was holding onto the side of the pool in the deep end when defendant grabbed her around the waist from behind with both of his hands. Y.D. tried to move away from defendant but was unable to; defendant was holding her tight. Y.D. repeatedly told defendant to stop.

Defendant then took one of his hands and pulled his penis out of his shorts and pulled down Y.D.'s bikini bottom. He placed his hard penis against Y.D.'s buttocks and rubbed his penis back and forth between her buttocks for a couple of minutes. After defendant stopped, Y.D. pulled up her bikini bottom, got out of the pool, and ran home. During the incident, various people came and went in the nearby parking lot. Y.D. hoped that someone might see her through the plexiglass barrier that separated the pool from the parking lot, but no one did. She did not tell anyone about the incident until much later.

Despite the fact that the incident with defendant took place before she disclosed her father's abuse, she did not disclose this incident with defendant at the time she

---

[1] The jury was informed that "due to a bureaucratic error, criminal charges were not filed in this case until 2017." Defendant does not raise any issue regarding prosecutorial delay on appeal.

disclosed the abuse by her father. Y.D. explained that she delayed reporting defendant's abuse because she was afraid that people might think she was lying. Before the pool incident, Y.D. enjoyed a good relationship with defendant.

In April of 2012, Y.D. fainted at school, which prompted a call to child protective services (CPS).[2] On May 8, 2012, Y.D. spoke to a CPS social worker and told the social worker that defendant previously touched her inappropriately. On May 22, 2012, Y.D. was interviewed at the Special Assault Forensic Evaluation (SAFE) Center in Sacramento. During this interview, Y.D. demonstrated that defendant grabbed her vaginal area with his hands under her bathing suit while they were in the pool.

*F.D.'s Allegations*

Y.D.'s youngest brother, F.D., was 15 years old at the time of trial. He testified defendant inappropriately touched him when F.D. was five or six years old. F.D. was playing outside when defendant called him over to the backseat of a truck that had tinted windows. Defendant sat next to F.D. in the backseat and grabbed F.D.'s penis over his clothes. Defendant rubbed F.D.'s penis for about a minute. F.D. did not know what to do. Defendant then pulled down his own pants and took out his erect penis. Defendant placed F.D.'s hand on defendant's penis. Defendant then grabbed F.D. by the back of his neck and pushed F.D.'s head down onto his penis. Defendant then told F.D. to use his mouth to go up and down on defendant's penis; defendant kept one hand on F.D.'s neck, moving F.D.'s head. F.D. felt as if defendant's penis was in F.D.'s mouth for a long time. At one point, defendant told F.D. to stop, and F.D. did so. Defendant told F.D. not to tell his mother what had happened. F.D. purposefully stayed away from defendant after the incident. A few months or up to a year later, F.D. told his mother what had

---

[2] After Y.D. fainted, the paramedics responded to the school. Initially, defendant (an emergency contact) intended to accompany Y.D. to the hospital. Y.D.'s mother arrived and told school officials that defendant was sexually inappropriate with Y.D. and should not be allowed to ride in the ambulance. A mandated reporter contacted CPS.

3

happened. F.D. did not disclose the incident right away because he was worried defendant might hurt him if he did.

F.D. participated in a SAFE interview on July 26, 2012. The prosecutor played F.D.'s SAFE interview for the jury. F.D. acknowledged he did not initially tell the interviewer that defendant put his penis in F.D.'s mouth, but he disclosed that part before trial. F.D. also acknowledged that in the interview, he reported defendant improperly touched him in his grandparents' living room while his grandparents and siblings were present. At trial, F.D. maintained that defendant's molestation of him had occurred in the truck.

*J.D.'s Allegations*

J.D., who was 18 years old at the time of trial, testified that between 2006 and 2010, when he was between six and nine years old, defendant touched him inappropriately. The abuse first started when defendant told J.D., "let's go wash the truck." J.D. clarified that "the truck" was Rene's white Chevy Tahoe SUV. Defendant would take J.D. into the middle of the back seat and pull down J.D.'s shorts and underwear. Defendant would also pull his pants down just far enough so that he could pull them up quickly if anyone came near. Defendant would bend J.D.'s body over on the floor of the truck so that J.D. was on his hands and knees. Defendant would then place his penis inside J.D.'s buttocks to penetrate J.D. J.D. would sometimes "wiggle" or lie flat to avoid penetration.

Between 10 and 20 times, defendant moved his body back and forth as he rubbed his hard penis on J.D.'s buttocks. A couple of times, defendant ejaculated on J.D.'s buttocks. Either J.D. or defendant would use a towel to clean J.D. off. Defendant would tell J.D. not to tell his mom and that defendant would bring him a snack.

About the fifth time defendant did this, he also touched J.D.'s penis with his own penis as defendant was moving from behind J.D.'s buttocks. This happened in subsequent incidents as well. Defendant's penis would also touch J.D.'s testicles.

4

Twice, over J.D.'s protests, defendant took J.D.'s hand to rub defendant's penis back and forth. Defendant would then place his penis on J.D.'s buttocks and then defendant would ejaculate. One time, defendant put his penis in J.D.'s mouth while defendant moved back and forth until defendant ejaculated. At first, J.D. said this only happened once, but later testified that defendant put his penis in J.D.'s mouth two or three separate times.

J.D. testified that he tried to run away from defendant, but defendant would catch him and get mad. J.D. was afraid to tell defendant that he wanted defendant to stop; when he did tell defendant "no," defendant would get mad.

J.D. did not tell his mother about what was going on because he was scared that "[m]ore problems" would result. When J.D. was older, he disclosed to his mother what defendant had done because J.D. was still bothered by it. J.D. was interviewed at the SAFE Center in July 2012.

*Trial Court Proceedings*

With regard to Y.D., the prosecution charged defendant with one count of violating Penal Code section 288, subdivision (a)[3] (count one), and two counts of section 288, subdivision (b)(1) (counts two and three). With respect to F.D., the prosecution charged defendant with one count of violating section 288, subdivision (a) (count five). With respect to J.D., the prosecution charged defendant with six counts of violating section 288, subdivision (a) (counts six through eleven).[4] With respect to J.D., the prosecution also alleged that defendant, in violating section 288, had substantial sexual contact with a victim who was under the age of 14 years old, under 1203.066, subdivision

---

[3] Undesignated statutory references are to the Penal Code.

[4] Prior to the case going to the jury, the trial court granted the People's motion to dismiss count four.

5

(a)(8). The prosecution alleged in each count that the children were each under the age of 14 years old at the time of the respective offenses.

The jury found defendant guilty on all counts and found true the special allegation that he had substantial sexual contact with J.D.

The trial court sentenced defendant to an aggregate term of 32 years in state prison. The sentence consisted of consecutive upper term sentences of eight years on count two (§ 288, subd. (b)) and eight years on count three (§ 288, subd. (b)). For each of the remaining counts, the trial court sentenced defendant to consecutive terms of two years.

## DISCUSSION

### I

*Child Sexual Abuse Accommodation Syndrome Evidence*

#### A. Additional Background

Prior to trial, the prosecutor sought to introduce evidence of child sexual abuse accommodation syndrome (CSAAS) through the testimony of Dr. Anna Washington. In in limine motions prior to her testimony, the prosecutor offered that Dr. Washington would explain that an abused child often feels shame, concern, and love for the abuser and how memory and development can be affected by trauma. Dr. Washington, the prosecutor continued, could also assist jurors in understanding the myths or misconceptions regarding how abused children behave and different manners in which they cope, including factors unique to male children who have been abused. After a hearing outside the jury's presence on the matter, the trial court indicated it would admit the evidence for the purpose of dispelling misconceptions about child abuse, including explaining why an abused child's behavior might not be consistent with having been previously assaulted. The court also indicated that the jury would be properly instructed that such expert testimony is not intended and cannot be considered to determine whether

6

the allegation of abuse is true. Defense counsel said she had no objection as long as the prosecution followed the guidelines it set out.

Dr. Washington proceeded to testify that she is a clinical psychologist, and she works at the CARE Center at the University of California at Davis providing assessments and treatment for children and families who have a history of child abuse. She had previously testified in about 30 cases regarding CSAAS. Here, Dr. Washington testified as "an expert in the area of child sexual abuse and the affects that sexual abuse has on children." Dr. Washington testified that she did not know anything about this case or the complaining witnesses.

She testified that there is a myth that children get abused by strangers, when in fact most victims of child sexual abuse tend to be abused by someone they already know. She also explained the concept of "grooming" as "systematically preparing a child for sexual abuse and finding ways to make sure that a child is quiet about sexual abuse." In this context, the children and perpetrators tend to have a preexisting, positive, trusting relationship prior to the onset of sexual abuse. It may start with special attention to the child, appropriate and desirable physical touches that gradually become more ambiguous or invasive over time. The touching may be accompanied by threats, intimidation, or other types of manipulation. Grooming, according to Dr. Washington, can be different depending on the specific circumstances of the relationship with the child. Dr. Washington explained that most children "tend to seemingly go with sexual abuse" without threats, partly because they have conflicted feelings about the perpetrator. For example, if it is someone the child loves, depends on, or wants to have a relationship with, it would be very uncomfortable or threatening for that child to disclose the abuse because the relationship could be lost.

On direct examination, the prosecutor asked whether grooming could include offering food or toys or doing activities such as swimming or washing a car. Dr. Washington answered affirmatively, explaining "I would say any items or activities that

7

that child finds enjoyable and that could also include a special attention from the perpetrator as well." The prosecutor also asked whether nonverbal communication is used to signal to the child they should not disclose the abuse. Dr. Washington stated that a message to stay silent does not have to be explicitly said to a child, noting that sometimes the abuse is something that only happens when they're alone with the perpetrator or in other situations where other people are around but cannot see or understand what is happening. In response to the prosecutor's request for clarification on this point, Dr. Washington explained, "It may be situations where another caregiver for example is present but sleeping in the same room so they're not aware of what is going on, but the perpetrator may still sexually abuse the child in those circumstances. Or the perpetrator may bring the child to a public setting, for example, you know, a grocery store bathroom or something like that where there are lots of people around but they don't necessarily know that a child is being sexually abused in that bathroom stall." The prosecutor asked, "So in your experience have you worked with children who disclose being molested or abused in fairly public areas?" Dr. Washington replied, "I have, yes. It appears to be rather common." Dr. Washington then opined that a perpetrator might choose to do the acts in a public area in an effort to legitimize their behavior, or to send the message to that child that they are helpless in their position as no one will notice or intervene.

Dr. Washington explained that incremental disclosure was common; disclosure was more of a process rather than an "event." When the perpetrator and child have a close relationship, there tends to be longer delays in disclosing the abuse. In addition, a one-time incident of abuse might be easier for a child to disclose specific details of that event. She also testified that male victims tend to wait longer to disclose the abuse.

The prosecutor also asked Dr. Washington whether she worked with children who had been the victims of abuse by more than one perpetrator. Dr. Washington confirmed

8

that she had worked with that population and explained that in general, perpetrators tend to choose a victim who is more vulnerable.

On cross-examination, defense counsel asked about CSAAS. Dr. Washington testified CSAAS provides a framework for understanding some common myths about sexual abuse as well as some reasons that children may react to, or disclose, sexual abuse; CSAAS does not indicate whether a child was actually sexually abused. She clarified that much of her testimony would be included in that model; ways that children disclose and react to, as well as the dynamics of, sexual abuse are included in that model. She said her testimony was based on her clinical experience and overall body of literature and research on the topic.

At the close of evidence, the trial court instructed the jury with CALCRIM Nos. 332 regarding expert witness testimony, 333 regarding opinion testimony of lay witnesses, and 1193 regarding CSAAS evidence. Specifically, CALCRIM No. 1193 states, in part, that CSAAS is not evidence that the defendant committed any of the crimes charged against him or her, and may be considered only in deciding whether or not the victims' conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of the alleged victim. (CALCRIM No. 1193.)

*B. Analysis*

On appeal, defendant challenges the introduction of CSAAS evidence, faulting the court, prosecutor, and defense counsel for their role in allowing the evidence to be introduced. Defendant argues that the trial court erred in allowing the expert to testify because the evidence was: (1) irrelevant as public awareness of the reporting dynamics around child sexual abuse has greatly increased since *People v. McAlpin* (1991) 53 Cal.3d 1289 (*McAlpin*), and there was no indication defendant's jury did not understand various reasons as to why a child might recant an abuse allegation; (2) unnecessary because the complaining witnesses were older at the time they testified and

9

explained their reasoning in delaying reporting of the abuse; (3) improperly tailored to fit the circumstances of the alleged abuse; and (4) more prejudicial than probative in violation of Evidence Code section 352 and his due process rights. Alternatively, defendant argues that the prosecutor committed misconduct by eliciting expert testimony beyond the scope of CSAAS, including testimony of factors "predictive" of child sexual abuse, and defense counsel provided ineffective assistance of counsel by failing to object to the introduction of this evidence. We disagree.

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) Similarly, Evidence Code section 801, subdivision (a) permits the introduction of opinion testimony by a qualified expert on a subject sufficiently beyond common experience when the opinion would assist the trier of fact. In addition, evidence is generally admissible if it is relevant. (Evid. Code, § 351.) Relevant evidence is that which has a tendency to prove or disprove a disputed fact that is of consequence to the determination of the action, including the credibility of a witness. (Evid. Code, § 210.) The court has discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) A trial court's decision to admit evidence is reviewed for an abuse of discretion. (*People v. Brooks* (2017) 3 Cal.5th 1, 43.) An appellate court cannot reverse a judgment based on the erroneous admission of evidence unless the admitted evidence "resulted in a miscarriage of justice." (Evid. Code, § 353, subd. (b).)

CSAAS is a model for understanding the behavior of children who have been sexually abused. The five components of the model are secrecy, helplessness, accommodation, disclosure, and recantation. (*People v. Mateo* (2016) 243 Cal.App.4th 1063, 1069.) In California, "it has long been held that in a judicial proceeding presenting

the question whether a child has been sexually molested, CSAAS is admissible evidence for the limited purpose of disabusing the fact finder of common misconceptions it might have about how child victims react to sexual abuse." (*In re S.C.* (2006) 138 Cal.App.4th 396, 418; see also *Mateo*, at p. 1069; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744 (*Patino*); *People v. Housley* (1992) 6 Cal.App.4th 947, 955-956; *People v. Bowker* (1988) 203 Cal.App.3d 385, 393-394 (*Bowker*).) Although expert testimony about how child sexual abuse victims commonly react is not admissible to show a child has in fact been sexually abused, it is admissible to show the alleged victim's conduct was not inconsistent with the conduct of someone who has been molested, and also to evaluate the believability of the alleged victim's testimony. (*Patino*, at pp. 1744-1745; *Housley*, at p. 955.) That other jurisdictions have resolved the issue differently also does not compel a contrary result. (*People v. Williams* (1997) 16 Cal.4th 153, 195 [case from a sister state is not controlling].)

Initially, we note that Dr. Washington's testimony regarding CSAAS was limited. Although she explained that CSAAS provides a framework for understanding some common myths about sexual abuse as well as some reasons that children may react to, or disclose, sexual abuse, she never testified to the actual components of CSAAS or link specific types of behavior to each component. Rather, she testified to her own personal observations regarding disclosure of sexual abuse by children based on her experience as a clinical psychologist at the SAFE Center. Permitting a witness to testify regarding a topic for which she has particularized training and experience does not offend the normal rules for admitting expert testimony, and defendant does not argue otherwise. (See Evid. Code, § 720.)

To be sure, portions of Dr. Washington's testimony were, effectively, consistent with CSAAS research and theory. (See, e.g., *Bowker, supra*, 203 Cal.App.3d at p. 389 [first articulated in 1983, CSAAS has five stages—secrecy, helplessness, entrapment and accommodation, delayed disclosure, and retraction].) She discussed common myths and

11

misconceptions regarding how child sexual abuse victims tend to report or disclose the abuse, including observations that disclosures may occur at different times and over a lengthy period of time (delayed disclosure). She also testified about the elements involved in grooming, such as warning the victim not to tell anyone (secrecy), and various techniques employed by the perpetrator to impart a feeling of helplessness on the victim or reasons why victims might accommodate the abuser. In addition, the parties treated the evidence as CSAAS. Defense counsel asked Dr. Washington whether CSAAS covered most of her testimony and Dr. Washington agreed that much of what she had testified to would be included within the CSAAS model, but she also indicated that her testimony was more general, some of which would not be included in the model. When asked to identify which portions of her testimony would fall outside of the model, she indicated her testimony about gender differences were not specifically discussed in CSAAS.

At the outset, the People claim that defendant forfeited his challenges to the evidence by failing to object in the trial court. We agree. The general rule is that when an in limine ruling admits evidence, the party seeking exclusion must object when the evidence is actually offered in order to preserve the issue for appeal, although a sufficiently definite and express in limine ruling may also serve to preserve a claim. (*People v. Brown* (2003) 31 Cal.4th 518, 547.) A judgment shall not be reversed based on the erroneous admission of evidence unless "[t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion." (Evid. Code, § 353, subd. (a).) The failure of counsel to state a timely and specific objection on the same ground raised on appeal forfeits that ground. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20-22; *People v. Partida* (2005) 37 Cal.4th 428, 433-434.)

Because defense counsel failed to object to the admission and use of CSAAS evidence, we address those issues within the context of defendant's claim that counsel

12

provided ineffective assistance in failing to so object.  Nonetheless, we find defendant's claims unpersuasive because, as discussed below, defendant cannot show counsel's performance "fell below an objective standard of reasonableness" "under prevailing professional norms," as there was no error that required an objection.  (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694 [defendant claiming ineffective assistance of counsel must show deficient performance resulting in prejudice].)

    1.  *CSAAS Evidence was Relevant to Dispel Common Misconceptions About Child Sexual Abuse.*

Defendant contends that as a matter of policy, CSAAS evidence should not be admissible because it no longer serves a purpose in today's society.  He claims there no longer exists misconceptions to correct and there was no reason to conclude his particular panel of jurors held any such misconceptions.  Accordingly, he argues, CSAAS evidence is no longer relevant.

More than 30 years ago in *McAlpin, supra*, 53 Cal.3d 1289, our Supreme Court held that while CSAAS evidence is not admissible to prove a victim has in fact been sexually abused, it is admissible " 'to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*Id*. at p. 1301.)  Defendant acknowledges that *McAlpin* remains the law in this state.  He also recognizes that California courts have routinely recognized "the well-established relevance, necessity, reliability, and importance of [CSAAS] evidence." (*People v. Munch* (2020) 52 Cal.App.5th 464, 472 (*Munch*).)

Nevertheless, he urges us to rely on out-of-state authority to conclude, contrary to *McAlpin*, that CSAAS evidence is categorically inadmissible because it is no longer necessary to dispel misconceptions about abuse; jurors are already well educated on the matter.  In the alternative, he urges us to depart from the reasoning in *Munch* and to determine that the holding in *McAlpin* is limited to cases in which there is evidence of

13

jurors who actually harbor some misconception(s) to dispel. In support of his claim that the public no longer has misconceptions about child victims of sexual abuse, defendant cites to a footnote from *People v. Robbie* (2001) 92 Cal.App.4th 1075, 1086, as well as to out-of-state and federal circuit cases concluding the reasons children do not come forward are within the range of common experience.

We decline defendant's invitation to deviate from *McAlpin* and its progeny. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [appellate courts must follow California Supreme Court decisions].) Moreover, we are not bound by out-of-state or federal circuit cases (*People v. Troyer* (2011) 51 Cal.4th 599, 610 [out-of-state cases not binding on California courts]; *People v. Williams* (2013) 56 Cal.4th 630, 668 [federal appellate authority not binding on California courts]) and, as courts have recently explained, "the vast majority of jurisdictions . . . have rendered decisions that are consistent with *McAlpin*." (*Munch, supra*, 52 Cal.App.5th at p. 472; see also *King v. Commonwealth* (Ky. 2015) 472 S.W.3d 523, 534-535 (dis. opn. of Abramson, J.) [41 states recognize the admissibility of accommodation syndrome expert testimony for some purpose, and six states have rejected any type of accommodation syndrome testimony].) Finally, *People v. Robbie* is easily distinguishable as it did not involve CSAAS evidence. Rather, in that case, the prosecutor argued that a juror would naturally understand that a rape is a harsh, violent, threatening, and unrelentingly brutal experience, leading to a "profile" for rapists. (*People v. Robbie, supra*, 92 Cal.App.4th at pp. 1085-1086.) The court noted that the "presupposition that the public shares the mistaken view articulated by the Attorney General is certainly debatable." (*Id*. at p. 1086, fn. 1.) In contrast, CSAAS evidence, when properly used, addresses the myths regarding the expected behavior of a child victim of sexual abuse, and does not identify a "profile" for either child sexual abusers, or their victims.

We likewise reject the merits of defendant's argument that CSAAS evidence is inadmissible because the reactions of child victims of sexual abuse no longer fall outside

14

the common experience of jurors in general or there were no misconceptions harbored by any juror in this case. Even if the public might generally be aware that sexual abuse occurs, and that victims of sex offenses may delay reporting for a myriad of reasons, such does not supply proof that there are no longer misconceptions about child sexual molestation. We certainly cannot assume such from the cases defendant cites, or that expert testimony on the subject would be unhelpful to the jury. (See *McAlpin, supra*, 53 Cal.3d at pp. 1299-1300 [even when the jury has some knowledge of the subject matter, expert opinion may be admitted whenever it would assist the jury].) Moreover, defendant does not point to any basis upon which to conclude that the jurors here did not harbor common misconceptions associated with child victims of sexual abuse. (See *People v. Lapenias* (2021) 67 Cal.App.5th 162, 172-173 [rejecting a similar claim when the record does not establish that all the empaneled jurors were aware of the entire spectrum of CSAAS evidence (secrecy, helplessness, entrapment, accommodation, and recantation)].)

        *2. CSAAS Evidence was Relevant to Rehabilitate Witness Credibility.*

Defendant additionally argues it was unnecessary for an expert to explain reasons why children might wait to report abuse when each complaining witness explained the delay. In particular, defendant argues that two of the three complaining witnesses testified as adults, and the third witness was 15 years old at the time of trial; each was capable of relaying their reasons for delayed disclosure. According to defendant, the expert testimony only served to improperly vouch for the credibility of the witnesses. We disagree.

CSAAS evidence is admissible "to rehabilitate [a child] witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her [or their] testimony claiming molestation." (*McAlpin, supra*, 53 Cal.3d at p. 1300.) Here, defendant attacked the credibility of the three witnesses by pointing out inconsistencies and delays in their disclosures. Defense

15

counsel questioned Y.D. about specific details of the event involving defendant in the pool; Y.D. could not remember the year, her age, whether it was morning or afternoon, or if anyone else was around at the time. Y.D. was also unable to remember how much time had passed between the incident and her first disclosure or between her first and second disclosure. During closing argument, defense counsel argued Y.D.'s actions at the pool (by failing to scream or in leaving her friend behind) were not reasonable if she had been molested. As to F.D., defense counsel elicited that he told the SAFE interviewer that defendant molested him on the couch with others around but at trial testified it happened in the backseat of a truck. F.D. was also unable to remember what year or time of year the alleged molestation took place. During closing argument, defense counsel drew attention to the discrepancies between F.D.'s SAFE interview and testimony. Finally, as to J.D., defense counsel vigorously cross-examined him regarding the details of the incidents with defendant. J.D. had difficulty remembering specific time frames or his age at the time of the molests. Defense counsel argued to the jury that J.D. did not thoughtfully answer questions posed to him, but instead just regurgitated the same story.

Because defendant asserted the complaining witnesses' conduct, as children, was inconsistent with their allegations of abuse, CSAAS evidence was admissible to rehabilitate the complaining witnesses' credibility. The fact that the complaining witnesses were older at the time of their testimony does not lessen its relevance. (See *Patino, supra*, 26 Cal.App.4th at p. 1744 [CSAAS testimony is admissible for the limited purpose of disabusing a jury of misconceptions it might hold about how a *child* reacts to a molestation].)

### 3. *The Scope of the Expert's Testimony Was Not Improper.*

We also disagree with defendant's argument that the scope of the CSAAS evidence was improper because it closely tracked the facts of the case and invited the jury to conclude the victims were in fact sexually abused. He argues that by linking the specific facts of the case to characteristics of common ways sexual abuse is perpetrated,

16

Dr. Washington impermissibly provided testimony that predicted the demeanor and characteristics of a sexual assault victim and violated the prohibition against introducing evidence that could lead jurors to conclude that Y.D., F.D. and J.D. were abused because they fit Dr. Washington's overall victim profile.

Much of defendant's argument is based on a misplaced reliance on *Bowker, supra*, 203 Cal.App.3d 385 and *People v. Clotfelter* (2021) 65 Cal.App.5th 30 (*Clotfelter*). In *Bowker,* a psychologist (Dr. Murphy) offered expert testimony on CSAAS. As the *Bowker* court noted, "Dr. Murphy's testimony accounted for nearly 70 pages of reporter's transcript and was replete with comments designed to elicit sympathy for child abuse victims and solicitations that children should be believed. Murphy in effect said regardless how inconsistent a child's accounts of abuse are, abused children give inconsistent accounts and are credible nonetheless." (*Bowker*, at p. 394.) Specifically, Dr. Murphy volunteered " 'It is very important that a young child, say, any age from four to ten, 12 years old, that they be believed.' " (*Id*. at p. 389.) He testified that inconsistency is commonplace and should not invalidate a child's account. (*Id.* at pp. 389-390.) Dr. Murphy ultimately painted a picture that matched what happened to the two children in the case. "[B]y delineating each stage of the CSAAS theory, Murphy constructed a 'scientific' framework into which the jury could pigeonhole the facts of the case." (*Id.* at p. 395.) The *Bowker* court thus concluded that an expert providing CSAAS testimony may not give " 'general' testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused." (*Id*. at p. 393.)

In *Clotfelter*, the appellate court found there was a dearth of direct evidence supporting the charges that the defendant communicated with teenage boys with an intent to commit a sexual offense. (*Clotfelter, supra*, 65 Cal.App.5th at pp. 60, 64-65.) The prosecution presented several experts, including Dr. Carmichael, who testified regarding CSAAS evidence and, as relevant here, testified that "the 'vast majority' of victims are

sexually abused 'by people they know and see regularly.' " (*Id.* at p. 62.) Without objection, the prosecutor also elicited CSAAS-type testimony from two police sergeants who each testified that, in their experience, it was not uncommon for children who have been sexually abused to delay reporting and/or fail to report the abuse at all. (*Id.* at p. 63.) During rebuttal argument to the jury, the prosecutor told the jurors, " 'A lot has been made about how the victims never thought they were victims and they didn't act like victims and they didn't present like victims and no one noticed signs that they were victims. [Defense counsel] made a lot of that. *But that is exactly why I put Dr. Carmichael on the stand to talk to you. He's an objective expert, he knew nothing about the case for good reason: So that he could testify about victimology, about how victims do and do not react to these kind of situations, how they do and do not present as victims in this case, and he told you that victims don't always show signs of abuse.*' " (*Ibid.*) The prosecutor also argued that victims don't react the way you might traditionally expect and that all the witnesses who provided CSAAS evidence " '*testified that they actually saw in practice in their extensive, extensive experience, training and experience working these cases.*' " (*Ibid.*)

The *Clotfelter* court did not take issue with the scope of the CSAAS expert's testimony, like defendant does here, but rather questioned whether the CSAAS testimony was relevant at all, as two of the named victims denied they had been touched inappropriately, and the court concluded evidence of the crimes alleged pertaining to a third victim was insufficient to find the defendant guilty. Furthermore, the *Clotfelter* court found the prosecutor's use and characterization of CSAAS evidence in closing argument improper. It concluded that while CSAAS testimony is admissible under some circumstances, such evidence is " ' "not admissible to prove that the complaining witness has in fact been sexually abused," ' " which the court held "is precisely the argument that the prosecutor was making to the jury; that it could use the CSAAS testimony to infer

18

that [the named victims] were victims of the crimes charged." (*Clotfelter, supra*, 65 Cal.App.5th at p. 64.)

While we recognize "the expert's testimony must be narrowly tailored to the purpose for which it is admissible" (*People v. Bothuel* (1988) 205 Cal.App.3d 581, 587, citing *Bowker, supra*, 203 Cal.App.3d at p. 394), we find Dr. Washington's testimony was limited to addressing common misconceptions about child abuse and explaining why the complaining witnesses' behavior were not inconsistent with his or her having been abused. (See *Bothuel*, at p. 587.) The instant case is vastly different than *Bowker* and *Clotfelter*. Here, neither the prosecution's questions nor the expert's responses tracked the complaining witnesses' testimony so closely that they "told the jury" it should believe the abuse allegations. To the contrary, Dr. Washington testified that CSAAS was not intended to be used as a diagnostic tool, and nothing about her testimony could be interpreted as leading the jury to conclude the complaining witnesses in this case were in fact sexually abused. The four points in Dr. Washington's testimony upon which defendant relies do not persuade us otherwise.

Defendant first argues that questions regarding whether it was common for sexual abuse to occur in close proximity of other people and/or public settings was designed to pigeonhole the account of the complaining witnesses into the framework of CSAAS evidence. Dr. Washington volunteered that sometimes abuse takes place in situations where other people are present but cannot see or understand what is happening. In providing examples of this, however, Dr. Washington did not include a swimming pool or a parking lot—the areas where the abuse took place in this case. Instead, she said examples included abuse when another caregiver was asleep in the same room or in a grocery store bathroom stall. In this regard, unlike in *Bowker*, Dr. Washington's testimony did not mirror the facts of this case. Although Dr. Washington said abuse in public settings was "rather common," there was nothing about her testimony that invited the jury to leap to the conclusion that because Y.D., F.D., and J.D. all described events

19

that took place in public settings, and abuse in public settings is common, the complaining witnesses must have actually been abused by defendant. Rather, evidence that abuse occurs in a public setting fits into the CSAAS's component by helping explain that victims may feel helpless, not only because of the nature of their relationship with the abuser, but because of the seemingly open manner in which the abuse is carried out.

For similar reasons, we reject defendant's contention that the use of swimming or washing a car as hypothetical examples of activities included in grooming constituted improper testimony. In response to those examples, Dr. Washington broadly answered, "I would say any items or activities that that child finds enjoyable and that could also include a special attention from the perpetrator as well." This testimony is too broad to constitute a mirror of the facts of the case or to invite the jury to find defendant guilty based on that characteristic. Contrary to defendant's claim, the fact that it is common for abusers to have a preexisting and enjoyable relationship with their victims, as the children here did, does not mean that the jury was asked to conclude defendant actually abused them. Dr. Washington's testimony merely informed the jury that perpetrators may take advantage of close relationships to act out their criminal intent. Dr. Washington did not say, and we conclude a jury would not be predisposed to opine, that a close relationship with a family member, by itself, gives rise to an inference of guilt. Additionally, this testimony specifically addressed the common myth in sexual abuse cases, that offenders are often strangers to their victims.

Defendant next objects to Dr. Washington's testimony that a child who has been previously sexually abused may have increased vulnerability to additional abuse, arguing such testimony is beyond the scope of CSAAS evidence and was merely designed to provide an expert explanation for why Y.D., who the jury learned had been previously abused by her father, would "allow a repeat of previously experienced sexual abuse." Defendant does not fully develop this argument, providing no analysis of the issue. Nonetheless, we find Dr. Washington's testimony that perpetrators tend to choose victims

20

who are more vulnerable, and such victims might be vulnerable for different reasons such as being nonverbal, having health problems, or being desensitized to sexual touch or contact possibly due to prior abuse, was permissible to explain that the failure to disclose abuse by more than one perpetrator is not inconsistent with the behavior of someone who has been abused.

Also contrary to defendant's claim, the fact that the children all had a positive relationship with defendant prior to his abusive conduct does not mean that the jury was asked to conclude defendant actually abused them, based on that characteristic. Dr. Washington's testimony merely informed the jury that perpetrators may take advantage of close relationships to act out their criminal intent. Dr. Washington did not say, and we conclude a jury would not be predisposed to opine, that a close relationship with a family member, by itself, gives rise to an inference of guilt.

4. *Evidence Code Section 352 and Due Process.*

Defendant argues because the CSAAS evidence was not relevant in this case, even the slightest prejudicial impact of the testimony justified its exclusion under Evidence Code section 352. He claims there was a high likelihood that the jury used CSAAS evidence not as a tool with which to evaluate credibility but as a diagnostic tool to conclude that, if the complaining witnesses behaved similar to the class of sexual abuse victims described, they must have been abused. He further argues that presenting this irrelevant and prejudicial evidence to the jury violated his right to due process. We disagree.

We have already found Dr. Washington's testimony was relevant to dispelling common misconceptions about the reactions and behaviors of child abuse victims. As we've also concluded, no reasonable juror could believe Dr. Washington's testimony was an attempt to prove defendant committed the charged offenses. "Evidence Code section 352 provides, in part, that '[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . .

21

create substantial danger of undue prejudice . . . .' ' "In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " ' (*People v. Karis* (1988) 46 Cal.3d 612, 638.) It involves evidence that tends to 'evoke an emotional bias against the defendant . . . which has very little effect on the issues.' (*Ibid*.)" (*Munch, supra*, 52 Cal.App.5th at pp. 474-475.) We do not find the CSAAS evidence in this case of a nature to evoke an emotional response. While one could characterize the evidence as damaging to defendant's case, we do not find it to be prejudicial.

In addition, the jury was instructed to not use CSAAS evidence as a diagnostic tool. Indeed, the pattern jury instruction, which was utilized in this case, explicitly instructed the jury that CSAAS evidence was to be used when assessing the credibility of the complaining child witnesses. (CALCRIM No. 1193.) We presume the jury followed this instruction, and thus the instruction prevented the prejudice defendant describes. (See *People v. Smith* (2007) 40 Cal.4th 483, 517 [" '[t]he crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions' "].)

Finally, contrary to defendant's claim, the admission of CSAAS evidence did not violate his right to due process. Generally, a trial court's compliance with the rules of evidence does not violate a defendant's right to due process. (*People v. Hall* (1986) 41 Cal.3d 826, 834-835.) Further, other courts have rejected the claim that the admission of CSAAS evidence violated due process. (See, e.g., *Patino, supra*, 26 Cal.App.4th at pp. 1744-1745; *People v. Lapenias, supra*, 67 Cal.App.5th at p. 174 [same]; see also *Amaya v. Frauenheim* (9th Cir. 2020) 823 Fed.Appx. 503, 505 [California court's ruling that the admission of CSAAS evidence did not violate federal due process was not contrary to, or an unreasonable application of, clearly established federal law].)

5. *The Nature of the Prosecutor's Questions to Dr. Washington*

Defendant argues the prosecutor committed misconduct when she posed fact-specific questions that directly connected the expert witness testimony to the testimony of

the complaining witnesses. Defendant argues this violated the trial court's order limiting the CSAAS evidence to opinions regarding CSAAS concepts. Because this argument relies heavily on the presumption that such evidence was improperly admitted—a presumption we have rejected—this argument fails.

" 'When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated. Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.' " (*People v. Masters* (2016) 62 Cal.4th 1019, 1052; see *People v. Wright* (2021) 12 Cal.5th 419, 443-444.) It is misconduct for a prosecutor to " ' "intentionally elicit inadmissible testimony." ' " (*People v. Smithey* (1999) 20 Cal.4th 936, 960.) So, too, when the prosecutor negligently elicits inadmissible testimony because there is no requirement that "a prosecutor must act with a culpable state of mind." (See *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

Contrary to defendant's claim, the prosecutor did not violate the trial court's order that Dr. Washington's testimony come within the established parameters of admissible CSAAS evidence. We disagree that the prosecutor framed questions to Dr. Washington similar to those criticized by the court in *People v. Jeff* (1988) 204 Cal.App.3d 309, 338-339. In *Jeff*, the prosecutor called, as an expert witness, a licensed clinical social worker who had interviewed the complaining witness at the prosecutor's request. The prosecutor's purpose in calling the social worker, was to establish that the complaining witness exhibited certain symptoms commonly found in child molest victims. (*Id*. at p. 333.) Over defense objection, the prosecutor questioned the expert in substantial detail regarding the expert's interview and evaluation of the child witness, including some of what the child said to the expert, what emotions she exhibited, and the fears she

23

expressed about defendant. (*Id*. at p. 335.) The prosecution then called another expert, a psychologist, " 'to explain to the jury the nature of the symptoms commonly exhibited by children suffering from post child molest traumatic stress syndrome.' " (*Id.* at pp. 333-334.) The psychologist responded to hypothetical questions incorporating "the exact same facts and details as told by" the child to the social worker. (*Id*. at p. 338.) The psychologist explained that the child's emotions, fears, and reactions were the same symptoms exhibited by a child molest victim. (*Ibid.*) In noting that expert testimony "offered to rebut the inference the alleged victim was being untruthful" would be "permissible so long as it was limited to a discussion of victims as a class (e.g. children), and does not extend to a discussion and diagnosis to the witness at hand" (*id*. at p. 337), the *Jeff* court concluded the testimony of the two expert witnesses was improper and prejudicial because it was not offered to rehabilitate a wavering or equivocal complaining witness. Rather, "it told the jury that they should accept [the child]'s version of these events as true, that she was a victim, molested over a three-year period by defendant, because here is how typical child molest victims act and [the child] fits the mold perfectly." (*Id.* at p. 338.)

In contrast, Dr. Washington knew nothing about the complaining witnesses in this case or the charges against defendant. The prosecutor's questions were targeted at exposing generally held misconceptions regarding the behavior of child abuse victims that were relevant to rehabilitate the complaining witnesses. The delay in reporting presented an issue as to the credibility of the complaining witnesses. Dr. Washington's testimony was thus relevant to explain that "such normally self-impeaching behavior is not unusual for sexually abused children." (*Munch, supra*, 52 Cal.App.5th at p. 475; see *McAlpin, supra*, 53 Cal.3d at pp. 1300-1301.) The prosecutor's use of the testimony went no further than that permissible use. At no time did the prosecutor assert that from the expert's testimony, the jurors could infer that the complaining witnesses were telling the truth. It was up to the jury to decide whether Dr. Washington's explanation of

delayed reporting applied to the witnesses' circumstances.  (See *Patino, supra*, 26 Cal.App.4th at pp. 1744-1745 [aspects of CSAAS are as consistent with false testimony as with true testimony; CSAAS is probative and admissible if it is geared toward the child's credibility as opposed the defendant's culpability].)

> 6. *Defense Counsel Was Not Ineffective in Failing to Object to the CSAAS Evidence.*

Finally, we see no ineffective assistance in defense counsel's failing to object to the CSAAS evidence.  First, we have concluded no impropriety in the admission or use of the evidence.  Nonetheless, " '[I]n determining whether counsel's performance was deficient, we exercise deferential scrutiny.  [Citations.]  The appellant must affirmatively show counsel's deficiency involved a crucial issue and cannot be explained on the basis of any knowledgeable choice of tactics.  [Citation.]  [¶]  Our Supreme Court recently reiterated the obligations of appellate courts in reviewing claims of ineffective assistance of counsel:  " ' "Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of professional assistance.' " [Citation.]  "[W]e accord great deference to counsel's tactical decisions" [citation], and we have explained that "courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight" [citation].  "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." [Citation.]' " [Citation.]' [Citation.]" (*People v. Loza* (2012) 207 Cal.App.4th 332, 351.)

"[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502; see also *People v. Boyette* (2002) 29 Cal.4th 381, 433.)  Here, the record shows that defense counsel had good tactical reasons for not objecting to the prosecutor's CSAAS evidence.  Because CSAAS evidence, as elicited at trial, was admissible, objecting to it

would have been futile.  Counsel is not ineffective for failing to make frivolous or futile motions.  (*People v. Thompson* (2010) 49 Cal.4th 79, 122.)

## II

### *Juror Misconduct*

Defendant argues that when Juror No. 5 complained of feeling bullied by another juror, the trial court's inquiry into the matter was insufficient to ensure the absence of juror misconduct.  We disagree.

### *A.  Additional Background*

The jury began deliberations on May 25, 2021.  On May 28, 2021, the court informed the parties that Juror No. 5 made a comment to the court's bailiff, in which Juror No. 5 "indicated to the bailiff that she feels bullied and . . . she's, quote, 'Just going to let whatever they want to do to let it ride.'  End quote.  [¶]  The bailiff indicated to her that she is to follow the instructions given by the Judge to vote whatever you thought . . . and I was informed thereafter."  The court stated it intended to conduct an inquiry with Juror No. 5 to ascertain whether that statement was true and to investigate the possibility of juror misconduct.  The court planned to "ask questions as to whether she has been able to deliberate with the others and exchange her ideas with other jurors and them exchanging their ideas with her."  At that point, the court explained, the goal was to collect information and not to direct Juror No. 5 in any particular way.  After the discussion with Juror No. 5, the parties would discuss the next steps.  The parties agreed with this procedure.

When the court examined Juror No. 5, the juror confirmed her statement to the bailiff.  The juror explained that "at times when [she] had expressed what [her] particular stance was or viewpoint was on something at one point in time . . . [her] character was assaulted," and the juror was told by another juror that she "lacked commonsense."  The next day, the juror came back to the deliberation room and told the other jurors that when she expressed her viewpoints, someone attacked her character and said she did not have

26

common sense.  The juror told the others she thought this was unfair; other jurors know nothing about her and it was inappropriate to attack her character when the purpose of deliberations was to express differences of opinion.

The following colloquy then took place between the court and Juror No. 5:

THE COURT:  "[I]n terms of the deliberations . . . [h]ave you felt that you have had the opportunity to share your ideas and your views with the other members of the jury?

"JUROR NO. 5:  Um, the opportunity was there, but it was the repercussions that concerned me that came after.

"THE COURT:  Yes. . . . what I'm asking is to check to make sure that you have been able to deliberate and discuss the case with the other jurors including your views about the case.  Have you been able to do that?

"JUROR NO. 5:  Yes.

"THE COURT:  Okay.  Have the other members of the jury been able to do the same with you?  Have you been able to hear their discussions and consider their discussions and ideas about the case?

"JUROR NO. 5:  Yes.

"THE COURT:  Okay. In terms of the exchange of ideas and discussions about the case, have you found that there has been anything that has prevented you or anyone from being able to engage in that discussion in deliberation?

"JUROR NO. 5:  Um, yes and no.

"THE COURT:  Go ahead.

"JUROR NO. 5:  I will say no in that the other jurors continue to express, you know, whatever their views were, and me expressing views . . . along the lines of what theirs were in addition to other sentiments was not received well . . . . What I mean is information that was presented by both sides; the People and the defense."

When asked to explain, Juror No. 5 stated that if she had not "echo[ed]" the sentiments of the other jurors, she was "cut off." She told the court, "I got the impression that if I did not go along with what the majority was saying it was not okay with the group." She continued by stating, "The concern I had was the bullying and the intimidation, like I said, and being attacked because of something that was expressed that was not in the favor of the majority of what everyone else felt. That's the concern I had." Juror No. 5 also mentioned that her status as a mother had been challenged.

Juror No. 5 also explained that when the results of a secret ballot were tallied, the same juror who made the comment about Juror No. 5 lacking common sense, "jumped up and expressed that -- felt that they couldn't proceed with the deliberation . . . because whoever responded that way had to be prejudice[d]. They were biased." Although the vote was anonymous, Juror No. 5 felt that comment was directed at her.

The following additional colloquy then ensued:

"THE COURT: Okay. And . . . at least as of this morning . . . you were just going to let whatever they want to do to let it ride. Is that what you mean? Does that relate to what you just told me here?

"JUROR NO. 5: It does. Yes.

"THE COURT: Okay. So are you feeling that your view or your vote on the case will be something other than how you truly feel about how the vote should be, or am I reading that wrong?

"JUROR NO. 5: Um, it would be certain aspects of it if I could say that. Certain aspects of it.

"THE COURT: Okay.· So you are considering voting in a way that you don't agree with. Is that what you mean in some ways?

"JUROR NO. 5: Um, I want to say in certain aspects and when I say by that -- can -- I just want to say counts."

28

The juror clarified that when she said she was going to "let it ride," this meant that she was considering voting the opposite of how she felt about the case on certain counts. Juror No. 5 also stated, "And let me be very clear on me saying -- expressing my views. It was not necessarily my views. It was how I understood evidence that was presented. So it was me interpreting what my understanding was of what was presented, what I heard, or what I observed or saw. So it was never my personal viewpoint. It was simply sticking to what was presented." Juror No. 5 also admitted that at the start of deliberations, she made an inappropriate joke involving the visualization of the offenses alleged. Nobody objected at the time of the joke, but when Juror No. 5 objected to being disrespected, the same person who told her she lacked common sense, objected to the joke and Juror No. 5 said she apologized.

After the court excused Juror No. 5 from the courtroom, the defense requested that the court talk to the foreperson[5] regarding the allegations of bullying by Juror No. 5. The court denied the request for further inquiry, finding that no further inquiry was necessary because even if the information conveyed by Juror No. 5 was true, it would not rise to the level of juror misconduct or otherwise necessitate further inquiry of other jurors. The court noted, "She described various aspects of the deliberative process which the Court understands includes disagreement and includes her expressing her views that were sometimes met with immediate retorts and in . . . Juror No. 5['s] . . . words cut her off. So I'm aware of that report from her. [¶] However, the Court's view given everything I heard this morning, there is no indication of juror misconduct as to other jurors aside from . . . Juror No. 5 . . . . And again, I'm considering those comments as if they were true, and in themselves or even collectively they do not rise to the level of misconduct of other jurors. [¶] So therefore, I do not find that a further inquiry of other jurors is

---

[5] The parties agreed the foreperson could not be the same person who made the comments to Juror No. 5.

necessary in this case in that no further inquiry of the foreperson is necessary in this case as well." In support of its ruling, the trial court cited *People v. Keenan* (1988) 46 Cal.3d 478, *People v. Orchard* (1971) 17 Cal.App.3d 568, and *People v. Engelman* (2002) 28 Cal.4th 436.

As for Juror No. 5, both defense counsel and the prosecutor agreed that Juror No. 5 should be dismissed. The prosecutor noted that even if there had not been misconduct, there was a potential for misconduct in that Juror No. 5 had indicated she was willing to give in and vote in a manner contrary to her belief. Thereafter, the court dismissed Juror No. 5 and swore in Alternate Juror No. 1. The court instructed the jury that it must not consider the substitution of jurors for any purpose, and it must begin deliberations anew after it seated the alternate juror.

### B. Analysis

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' "capable and willing to decide the case solely on the evidence before it." ' " (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294.) If at any time, upon good cause shown to the court a juror is found to be unable to perform his or her duty, the court may order the juror to be discharged. (§ 1089.)

In general, the "court must conduct a sufficient inquiry to determine facts alleged as juror misconduct 'whenever the court is put on notice that good cause to discharge a juror may exist.' [Citation.]" (*People v. Davis* (1995) 10 Cal.4th 463, 547; see *People v. Martinez* (2010) 47 Cal.4th 911, 942.) Not every incident warrants investigation, however. (*People v. Cleveland* (2001) 25 Cal.4th 466, 478.) The decision whether, and to what extent, investigation into possible juror bias is required " 'rests within the sound discretion of the trial court.' " (*Ibid.*; see *People v. Maury* (2003) 30 Cal.4th 342, 434.) If substantial evidence exists to support the trial court's exercise of its discretion, the

court's action will be upheld on appeal. (*Maury*, at p. 434.) Here, defendant has not shown the trial court abused its discretion.

First, we note that Juror No. 5 was discharged because she told the court she was prepared to vote contrary to her beliefs; she was essentially unable to deliberate. This justified her discharge. (See *People v. Thompson, supra*, 49 Cal.4th at p. 138 [trial-related and non-trial-related stress can provide good cause for discharging a juror when it results in inability to deliberate].) Thus, contrary to defendant's claim, it was not established Juror No. 5 was actually bullied, just that she felt attacked. Regardless of the cause of the perceived hostility, substantial evidence supports the conclusion that any misconduct was limited to Juror No. 5, and therefore no additional investigation was necessary. The colloquy between the court and Juror No. 5 demonstrates that Juror No. 5 was the only one who was having difficulty in the deliberation process. Other jurors were able to present their positions and ideas and, as such, the trial court had insufficient information upon which to conclude that good cause existed to discharge any other juror.

Indeed, courts have cautioned, "a trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations. The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations." (*People v. Cleveland, supra*, 25 Cal.4th at p. 485.) "During deliberations, expressions of 'frustration, temper, and strong conviction' may be anticipated but, in the interest of free expression in the jury room, such expressions normally should not draw the court into intrusive inquiries." (*People v. Engelman, supra*, 28 Cal.4th at p. 446, citing *People v. Keenan, supra*, 46 Cal.3d at p. 541.)

*People v. Thompson, supra*, 49 Cal.4th 79, provides further guidance. In that death penalty case, a juror requested to be excused during penalty phase deliberations, claiming she was incapable of deliberating further. The juror told the trial court that she could not make a decision in the penalty phase because she felt " 'pressured' " to come to

certain conclusions at the guilt and penalty phases. (*Id*. at pp. 135-136.) The court discharged the juror. On appeal, the California Supreme Court rejected defendant's contentions the trial court abused its discretion because it did not adequately investigate misconduct by the other jurors before discharging the juror and that it should have questioned other jurors to determine whether they were impermissibly pressuring jurors to give up their lingering doubt about defendant's guilt. The court concluded that because the source of the tension was the deliberations themselves, the trial court properly exercised its discretion in refraining from questioning other jurors, which would have threatened intrusion into the process. (*Id*. at p. 137.) Here, too, the ostensible source of the tension reported by Juror No. 5 was the deliberations themselves, and the trial court acted within its discretion in not examining the other jurors, doing so would have threatened to intrude on the deliberation process. Defendant's contention that the other jurors may have also felt threatened is speculative; the trial court's questioning of Juror No. 5 revealed no such suggestion.

We find substantial evidence supports the trial court's decision to refrain from further investigation into juror behavior.

## III

### *Hammon Review of Education Records*

When Y.D. accused her father of sexually abusing her, she did not disclose any allegations against defendant. Prior to trial, defendant requested an in camera review of Y.D.'s educational records pursuant to Evidence Code section 782, arguing this was relevant to her credibility regarding past sexual conduct. The trial court reviewed the documents and found nothing relevant triggering a duty to disclose otherwise confidential records. On appeal, the parties agree that it would be appropriate for us to review those documents as well.

In *People v. Hammon* (1997) 15 Cal.4th 1117, 1128, the California Supreme Court declined to "extend the defendant's Sixth Amendment rights of confrontation and cross-

32

examination to authorize pretrial disclosure of privileged information." However, the court also recognized that "[w]hen a defendant proposes to impeach a critical prosecution witness with questions that call for privileged information, the trial court may be called upon . . . to balance the defendant's need for cross-examination and the state policies the privilege is intended to serve. [Citation.]" (*Id.* at p. 1127.)

We have reviewed the education records pertaining to Y.D. After reviewing the records, we conclude that the trial court did not err in ruling that there was no information in the records that could have been used to impeach Y.D. or to support the defense theory. The education records did not include any information relevant to the issues at trial. We find no error.

IV

*Sentencing*

Defendant argues we must remand the matter to permit the trial court to reconsider the upper term sentences in light of recent statutory changes that apply to him retroactively. The People agree that the recent amendments apply retroactively to defendant, and that resentencing is required. We agree Senate Bill No. 567 " 'applies retroactively in this case as an ameliorative change in the law applicable to all nonfinal convictions on appeal.' " (*People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1109; see also *In re Estrada* (1965) 63 Cal.2d 740, 744-746.) We also agree defendant is entitled to the benefits of the amendments.

*A. Additional Background*

At sentencing, the trial court considered the triad sentencing options in place at the time of the offenses to be three, six, or eight years.[6] The trial court found the following

---

[6] This was at defendant's request with no objection by the prosecution. Effective September 9, 2010, the statute was amended to increase the triad to five, eight, ten for

circumstances in aggravation:  (1) defendant took advantage of a position of trust to commit the offense (Cal. Rules of Court, rule 4.421(a)(11)) and (2) the crimes involved acts disclosing a high degree of cruelty and callousness (Cal. Rules of Court, rule 4.421(a)(1)).  Based on these factors, the court sentenced defendant to upper term sentences of eight years on count two (§ 288, subd. (b)) and eight years on count three (§ 288, subd. (b)).  For the remaining counts, the trial court sentenced defendant to terms of two years (one-third the midterm of six years) on counts one, and five through eleven.  Citing to California Rules of Court, rule 4.425(a)(1), the court found the crimes involved separate acts of violence or threats of violence justifying consecutive terms.

*B.  Analysis*

While defendant's appeal was pending, section 1170 was amended by Senate Bill No. 567 (2021-2022 Reg. Sess.; Stats. 2021, ch. 731, § 1.3.)  As amended, section 1170, subdivision (b) permits imposition of an upper term sentence "only when there are circumstances in aggravation of the crime that justify" the upper term and only if "the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial."  (§ 1170, subd. (b)(2).)  However, "the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury."  (§ 1170, subd. (b)(3).)  Additionally, as relevant here, section 1170, subdivision (b)(6) provides:  "[U]nless the court finds that the aggravating circumstances outweigh the mitigating circumstances [and] that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense:  [¶]  (A) The person has experienced psychological, physical,

violations of section 288, subdivision (b) but it remained at three, six, eight years for violations of subdivision (a).  (Stats. 2010, ch. 219, § 7.)

34

or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence.  [¶]  (B) The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense" and the defendant's youth "was a contributing factor in the commission of the offense."  (§ 1170, subd. (b)(6), effective Jan. 1, 2022; see also § 1016.7, subd. (b) ["A 'youth' for purposes of this section includes any person under 26 years of age on the date the offense was committed"].)[7]  We note section 1170, subdivision (b)(6)(B) does not require imposition of the lower term in every case in which the defendant was under age 26 at the time the crime was committed.  Rather, this provision establishes a presumption of the lower term if the defendant's youth was "a contributing factor" in his or her commission of the crime "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice . . . ."  (§ 1170, subd. (b)(6).)

In this case, the parties agree the court relied solely upon factors that were not admitted by defendant, proven through certified records of conviction, or found true beyond a reasonable doubt by a jury.  (§ 1170, subd. (b).)  As such, consideration of these factors was improper under the newly amended statute.  (See, e.g., *People v. Zabelle, supra*, 80 Cal.App.5th at pp. 1109-1111.)

In addition, defendant was under the age of 26 at the time he committed some, if not all, of the offenses, was sentenced without the benefit of this amendment, and the record does not otherwise demonstrate that defendant's youth was considered in imposing the sentence.  Because a court that is unaware of the scope of its discretion necessarily abuses that discretion (*People v. Carmony* (2004) 33 Cal.4th 367, 378), the trial court's ruling is an abuse of discretion and defendant is entitled to an opportunity to

---

[7]  Section 1016.7 was added by Assembly Bill No. 124 (2021-2022 Reg. Sess.; Stats. 2021, ch. 695, § 4).

ask the court to exercise its discretion within the full range of possible sentences in mind.[8]

Accordingly, we agree the amended law under section 1170, subdivision (b) requires defendant's sentences be vacated. We further conclude that remand to the trial court is necessary for it to apply the newly amended law, including all applicable provisions of section 1170 amended through Senate Bill No. 567, in the first instance and decide whether defendant is entitled to the lower term.[9] (See *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039.)

---

[8] In light of this conclusion, we need not decide defendant's claim that the trial court based its decision to impose the upper term on underlying facts that were not proven in a statutorily permissible manner.

[9] We note there are discrepancies between the oral pronouncement of judgment and the abstract of judgment where the court imposed victim restitution, fines, penalties and assessments but they do not appear on the abstract. In addition, the days listed under credit for actual days appear have been switched with the number of days awarded for conduct credit. For counts three and five through eleven, the date of offense is incorrectly listed as 2021. For counts one and five through eleven, the offense is incorrectly listed as "oral copulation" instead of "lewd and lascivious act." Because defendant is entitled to a new sentencing hearing after which a new abstract will be generated, we need not substantively address these errors.

## DISPOSITION

We reverse the sentences and remand the matter to the trial court so that it may resentence defendant consistent with amended Penal Code section 1170.  The judgment is otherwise affirmed.

/s/
_____
EARL, J.

We concur:


/s/
_____
RENNER, Acting P. J.


/s/
_____
BOULWARE EURIE, J.